Filed 6/15/22  P. v. Dinaali CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | E074324 |
| Plaintiff and Respondent, | (Super.Ct.No. FVI1500919) |
| v. | OPINION |
| ALADDIN DINAALI, | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Bryan K. Stodghill, Judge.  Affirmed as modified.

William G. Holzer, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha

Cortina, Annie Featherman Fraser and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

## I. INTRODUCTION

A jury found defendant and appellant, Aladdin Dinaali, guilty as charged of five offenses: stalking (Pen. Code, § 646.9, subd. (a),[1] count 1); extortion (§§ 518, 519, count 2); sending a threatening letter with the intent to extort (§ 523, count 3); violating a civil restraining order, a misdemeanor (§ 166, subd. (a)(4), count 4); and filing a false instrument with a public office, namely, a mechanics lien (§ 115, subd. (a), count 5). Defendant was sentenced to six years four months in state prison: the upper term of four years on count 2, consecutive eight-month terms on counts 1 and 5, and a consecutive one-year term on count 3. A concurrent 365-day county jail term was imposed on defendant's misdemeanor conviction in count 4.[2]

Defendant represented himself at trial, but after the jury returned its verdicts he asked the court to appoint counsel to represent him in posttrial proceedings. The court appointed Peter S. to represent defendant in all posttrial proceedings and denied defendant's subsequent *Marsden*[3] motion to relieve Peter S.

---

[1] Undesignated statutory references are to the Penal Code.

[2] Defendant was awarded 1,444 days of presentence custody credits: 722 actual days and 722 good conduct days.

[3] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

2

In this appeal, defendant claims: (1) insufficient evidence supports his convictions in counts 1 through 5; (2) the court erroneously failed to give unanimity instructions, sua sponte, in counts 2 and 5; (3) the court erroneously denied his *Marsden* motion to relieve his appointed counsel, Peter S.; and (4) the court erroneously failed to stay at least one of his sentences on counts 3, 4, and 5. We agree that defendant's concurrent 365-day jail term on count 4 should have been stayed because that count was based on the same acts underlying counts 3 and 5. We find no merit to any of defendant's other claims of error and affirm the judgment in all other respects.

## II. BACKGROUND

A. *Prosecution Evidence*

### 1. The Events of July 2014 to September 2014

In July 2014, Michele B. lived in a manufactured home in Phelan with her husband, Mark B., and her teenage daughter. Michele handled all of the family's finances and paperwork, and she was in the process of obtaining an FHA (Federal Housing Act) loan to refinance the existing loan on the family's home. The home sat on concrete blocks. On July 2, an appraiser valued the home at $125,000. The appraisal stated that the home met minimum HUD (Housing and Urban Development) standards.

Adrian Q. worked at a mortgage brokerage firm and was helping Michele with her refinancing. The lender was requiring a physical FHA inspection of the property. On July 8, 2014, Adrian Q. obtained a list of FHA inspectors, which included defendant, and he called defendant to perform the property inspection. On July 9, Adrian Q. asked defendant to physically inspect the property and e-mailed defendant a copy of the

3

appraisal, Michele's contact information, and a statement that Michele would be responsible for paying the $150-$200 inspection fee. Later on July 9, Adrian Q. e-mailed defendant, saying he would contact defendant the next day with the items that the lender needed defendant to address in his inspection report.

On July 10, 2014, Adrian Q. e-mailed defendant with the items the lender needed defendant to address in his report: (1) the property "must not have been installed or occupied previously at another location. Any structural modifications to the subject property must be approved by a licensed professional engineer or local, state, or federal authority"; (2) the property "must be permanently connected to a public sewer/septic tank and other utilities that meet local, state, and federal requirements"; and (3) "a copy of the engineer's foundation report, verifying the subject foundation meets HUD's manufactured home permanent foundation guidelines." The e-mail included a permit issued the previous year for a sewer-septic tank and advised defendant that he could access a crawl space beneath the home to confirm that the foundation was permanent.

At 6:06 p.m., on July 10, 2014, defendant advised Adrian Q., by e-mail, that he could perform the physical inspection the following week. At 6:24 p.m., Adrian Q. e-mailed defendant that he was waiting to hear back from the lender, and he agreed to schedule the inspection for the following week, but he asked defendant to wait before contacting Michele to schedule the inspection. At 6:50 p.m., defendant e-mailed Adrian Q. that he had found problems with the property, even though he had not physically inspected the property. At 7:01 p.m., Adrian Q. e-mailed defendant that he had taken care of "those problem issues." By this time, the lender had already told Adrian Q. that it

4

would not require a physical FHA inspection of the property, and Adrian Q. intended to tell defendant that his services were no longer needed.

Before Adrian Q. could cancel the inspection, defendant e-mailed Adrian Q. at 8:16 p.m., on July 10, 2014, saying he would "red flag" the property in the morning. Adrian Q. did not know what that meant.

At 1:09 p.m., on July 11, 2014, Adrian Q. e-mailed defendant, canceling the inspection and thanking defendant for his time. At 1:46 p.m., defendant called Michele, despite Adrian Q.'s cancelation of the inspection. At that time, Michele understood that the loan required an inspection and she was expecting defendant to contact her. She described defendant's demeanor during the call as "very aggressive," "hostile and bullying." Defendant told Michele that she needed to contact her broker and "get" her broker to "understand" that she needed a more comprehensive inspection. Around 2:00 p.m., Michele called Adrian Q. and asked him to find a new inspector because she did not like the way defendant spoke to her, she did not know what defendant was talking about, and she felt uncomfortable having defendant come to her home.

At 2:13 p.m., on July 11, 2014, defendant e-mailed Adrian Q., stating, "Please be advised that unless you order an inspection of the property before 4 p.m. today, I will start legal proceedings against you, the lender, and the borrower for fraud upon government and endangerment of the public." The e-mail also stated that defendant would do his best to stop Michele's loan application and ensure that the lender and the appraiser no longer worked on the project, unless Adrian Q. ordered the inspection.

5

At 2:16 p.m., on July 11, 2014, defendant called Michele and told her that her broker had canceled the inspection but she was still responsible for ordering an inspection. He also said she would be subjected to fines and fees and be reported to state and federal authorities if she did not order an inspection. Michele told defendant she would contact her broker again and ended the call.

At 2:58 p.m., on July 11, 2014, Adrian Q. e-mailed defendant, again canceling the inspection and instructing defendant not to contact Michele again. At 3:15 p.m., defendant called Michele, but she let the call go to voicemail. In a voicemail message, defendant told Michele he would file criminal charges against her unless she ordered the inspection from him before 4:00 p.m. Michele then called Adrian Q., who told Michele to ignore defendant.

On Saturday, July 12, 2014, defendant e-mailed Adrian Q., saying that Adrian Q. should be fired; Adrian Q. was "collud[ing]" with the lender and others to defraud the FHA and taxpayers; the appraiser had overvalued the property; defendant had a contract with Michele; Michele was *defendant's* client and Adrian Q. had no authority to fire defendant; Adrian Q. had defamed defendant; defendant would use the internet to "hit the reputations of all the culprits involved in this project very severely"; defendant had filed a complaint with the building department, and would file suit against Adrian Q. if Adrian Q. did not cease and desist his activities.

The July 12, 2014 e-mail to Adrian Q. also stated: "*You should be aware that I have now completed my task and I am due my fees. I'll invoice the borrower and if she refuses to pay, I will put a lien on her property and take action in civil court until she*

6

*pay*[*s*] . . . ." Adrian Q. testified that defendant was not owed any fees because he had not performed the physical FHA inspection.

On July 12, 2014, defendant called Jason M., Michele's mortgage broker, for whom Adrian Q. worked. Defendant told Jason M. that the property needed extensive repairs and permits, and suggested that the borrowers obtain a "203k loan" to finance the necessary repairs. Jason M. told defendant they could pay him for his services but did not need him anymore. Defendant said, " 'Well, we can do a 203k loan. I'm a general contractor. I can do the work. They can cash out $35,000 and I can fix the house.' "

Jason M. told defendant that the borrowers did not need any of the work defendant was describing and told defendant he was " 'being a little fraudulent here. I think you're trying to cash out on them, cash them out to take over the general contractor claim.' " Defendant then became "a little belligerent and started yelling." He said he would get Jason M.'s license revoked and would prosecute Jason M. " 'to the fullest extent of the law,' " unless Jason M. did what he was demanding. Jason M. told defendant that the property " 'should be fine now' " because it had been inspected around 18 months earlier.

On Monday, July 14, 2014, defendant sent an email to Jason M., stating that unless Jason M. gave defendant "immediate access" to the property to physically inspect it, defendant would, among other things, call the fire department to inspect the property *on defendant's behalf*, "in which case it will cost the property a whole amount of money for code violations and required repairs . . . into the thousands of dollars." The e-mail gave Jason M. "one hour" to comply with defendant's demands or defendant would "file further reports against all of you."

Later on July 14, Jason M. called defendant and reminded him that the inspection had been canceled. But defendant continued to threaten Jason M., Michele, and others, and claim that the property was unsafe. At 3:52 p.m. on July 14, defendant again e-mailed Jason M., stating he had just filed "federal criminal loan fraud charges" against Mark and Michele; to pass this information on to them because they had told him not to contact them, and he would be seeking an "inspection warrant" to enter the property.

At 5:47 p.m., on July 14, defendant e-mailed Jason M. that he had filed criminal complaints against Jason M. and Adrian Q., as well as against Mark and Michele. This e-mail asked Jason M. who would be paying for "the services" defendant had "performed" to "avoid" placing a lien on the property, and noted that, if defendant placed a lien on the property, "you would not be able to refinance. So please let me know who is going to pay me?" At 8:38 p.m., defendant e-mailed Jason M. that he had told the fire marshal and the building and safety division of the county that a propane tank on the property was unpermitted and substandard.

Meanwhile, at 1:45 p.m., on July 14, 2014, defendant texted Michele, saying he had filed four administrative complaints against her, and she should e-mail or call him before he filed criminal complaints, which could "put" her "behind bars." At 1:53 p.m., Michele e-mailed defendant, saying he was threatening her, she did not want to work with him, she would hire another inspector, and if he contacted her again she would report him to HUD for harassment. She also informed defendant that she had read reviews about him on RipoffReport.com that said he was "a slanderer," he was "crazy,"

8

and advising people not to work with him. She also told defendant she would call the police if he attempted to enter her property.

Defendant then e-mailed Michele again, on July 14, 2014, saying he had generated an inspection report and asking whether she had read it. Michele responded by e-mail, telling defendant she had ordered a report from another "engineer" and not to contact her again. Michele then received several "compliance inspection reports" from defendant, on HUD-approved forms, concerning the property and signed by defendant as a "HUD inspector."

The first inspection report, dated and signed by defendant on July 11, 2014, stated that defendant was unable to inspect the property on July 11 because the "lenders and borrowers refuse entry for life and safety inspection." The July 11 report stated that the property's foundation, building, electrical, plumbing, mechanical, and grading systems were all "defective"; that "extensive unpermitted work" was "noted"; and that "extensive life and safety issues" were "present." The July 11 report also stated that the "appraisal" was "defective" and that a "CE [code enforcement] complaint" had been filed.

A second compliance inspection report, dated and signed by defendant on July 14, 2014, stated that, "despite several warnings about extreme hazardous conditions" at the property, the "owners, lenders, and brokers refuse to provide entry for inspection of life and safety issues"; in addition, the county building and safety division and the fire marshal had been notified of the dangerous conditions on the property and had been asked to inspect the property on HUD's "behalf." The report further stated: "Any appraisal and approval of this loan before investigation [is] considered defective."

9

Around 10 p.m., on July 14, 2014, defendant posted a report on RipoffReport.com, containing Michele's and Mark's names and address, defendant's allegations about the defects in their property, and claims that defendant was threatened that he should "sign off on the property" or be fired from the inspection assignment. He also created a "CrimeReports.online" webpage containing Michele's contact information and alleging she had committed crimes.

At 7:36 a.m., on July 15, 2014, defendant again e-mailed Michele with an invoice for $200 for "property permit and title check," stating, "Please pay the attached invoice immediately to avoid additional legal fees." The attached invoice stated that a mechanic's lien would be "placed against the property and additional fees will be charged" in case of nonpayment. A mechanic's lien would have prevented Michele's lender from approving her FHA loan. Jason M. gave Michele $200 to pay defendant, and Michele paid defendant the $200, not because she owed him for the canceled inspection, but because he was threatening her and she wanted him to "go away." Jason M. agreed that defendant was not owed the $200.

After he received the $200, defendant continued to contact Michele. On July 16, 2014, he e-mailed Michele, thanking her for the $200 payment, telling her she was entitled "to one free foundation inspection," but saying he did not need to inspect the inside of her house or "anything else" because he already knew its condition. In the same e-mail, defendant said the county would "soon" be inspecting the property, and Michele would "be forced to make the required corrections," but he hoped Michele could "get funding for some parts" of the repairs and "get" her "contractors to pay for others."

10

Defendant ended the e-mail by stating, "Let me know otherwise I will pursue my current path, costing you more than if you had listened to my advice."

On July 18, 2014, defendant e-mailed Michele, informing her that her foundation and plumbing had been modified without permits, but he could withdraw his complaints and help her avoid trouble with federal, state, and local agencies. He asked her to take pictures beneath her home, and he offered to help her with the financing of what he claimed were necessary repairs. Michele did not know whether her plumbing was properly permitted because pipes that ran through the bottom of the home had been replaced.

Meanwhile, Michele's mortgage brokerage firm hired a licensed civil engineer, Ingrid S., to inspect the foundation and determine whether it met FHA guidelines, even though the lender was not requiring an inspection. On July 15, 2014, Ingrid S. wrote a letter certifying that the home was on a "permanent foundation system" that met HUD requirements.

On July 23 and 24, 2014 defendant e-mailed Ingrid S., challenging her foundation inspection report. He also authored another compliance inspection report, dated and signed July 24, stating that Ingrid S.'s report was "criminally fraudulent" and that the "borrowers, lenders, appraisers, [and] engineers" were "in collusion to commit fraud."

On July 25, 2014, defendant again e-mailed Ingrid S., stating that the loan was fraudulent, he had filed criminal complaints against the parties involved, and he would file criminal complaints against her if she was complicit in the fraud. He claimed the county's code enforcement division would not act because Ingrid S.'s report was being

treated as a full inspection of the home.  He asked Ingrid S. to reinspect the property and remove any ambiguities in her report to prevent Michele's "fraudulent" loan from being approved.  At 4:12 p.m., on July 25, defendant e-mailed Ingrid S. that she had 30 minutes to rescind her report or he would "fil[e] against" the licenses of Ingrid S. and her assistant, William S., and file criminal charges against them.  At 8:00 p.m., on July 25, he e-mailed Ingrid S., stating he would post complaints online about Ingrid S. and William S.

On July 26, defendant again e-mailed Ingrid S., with a copy to Michele, stating:  "I really hope you guys would not be stupid enough to make me go through this but I will if I have to.  If there is an earthquake, there is not an iota of doubt that this house will move away from its lousy support and collapse like a house of cards.  If earthquake does not do it now, the heavy corrosion will do it eventually.  *This . . . house is a death trap.  If the owners are so stupid that they do not care for their own safety*, *I think they should die to teach a lesson to others* but the problem is that FHA and the taxpayers will have to foot the bill for these imbeciles and you crooks and that is where my job comes into play." (Italics added.)

The July 26, 2014 e-mail made Michele even more fearful of defendant and what he might do.  Before July 26, defendant was threatening Michele and others, but he was now saying that Michele and her husband should "die in the house."  After July 26, Michele no longer allowed her 16-year-old daughter to stay at home alone.  The home was in a rural area on a two and one-half acre lot, and there were no nearby streetlights or

12

neighbors. Michele would watch cars go by her home, wondering whether it was defendant.

On August 12, 2014, defendant authored another compliance inspection report for the property, stating that the water and electrical services to the property posed "life and safety risks" and should be disconnected "until such time as permits have been secured." Michele had not noticed any problems with the water or the electricity at her home. Also on August 12, defendant e-mailed his August 12 report to Michele's water district and asked the water district to shut off the water to the property.

The general manager of Michele's water district, Don B., called defendant in response to his August 12 e-mail and refused to shut off the property's water. Defendant became irate, yelled, and demanded that the district turn off the water. In his 20 years as the district's general manager, Don B. had never received "any kind of request like that from any inspector demanding that we turn off somebody's water." Don B. told defendant that he appeared to be making a fraudulent claim, and that he was not authorized to demand that the district shut off the property's water. Don B. ended the call, but defendant called back and "was threatening and yelling" that the district would be sued and that Don B. was incompetent. Defendant later e-mailed Don B. and copied the district's board members, saying that the property lacked plumbing permits, the district was providing water to a "substandard building," and advising Don B. to seek "mental health services."

On August 13, 2014, Don B. went to the property, observed its exterior, and saw no visible water leakage from the water service line to the home. Also on August 13,

someone named "Ali Fardi" e-mailed the water district's board members, saying Don B. was "a crazed paranoid and schizophrenic lunatic." Based on his conversations with defendant, Don B. believed defendant sent the e-mail. At trial, defendant also admitted to having lived with Fardi and having sometimes used Fardi's computer and e-mail address. Thereafter, defendant, again using Fardi's e-mail address, posted complaints on RipoffReport.com about the water district's board members.

On August 14, 2014, defendant issued yet another compliance inspection report, his fifth concerning the property, asking the water *and* power companies to shut off the water and power to the property. On the same day, defendant e-mailed numerous parties, alleging that Southern California Edison had initially declared the property's electrical panel to be unsafe but reversed itself following a second inspection. Defendant disagreed with the results of the second inspection and claimed that the improper sealing of the electrical panel presented a "HUGE FIRE HAZARD." He wrote, "This is a shame and disgrace on anybody in place of authority reading this for putting the lives of these suicidal homeowners in danger, never mind HUD and the taxpayers." Defendant wrote that Michele's FHA loan required HUD certification, but the home was not HUD certified, so the FHA loan had to be "annulled." By August 14, Michele had completed her refinance loan.

Jason M. reported defendant's threats and communications to HUD. On August 16, 2014, defendant e-mailed Michele, Jason M., and Adrian Q., stating that HUD officials had contacted him concerning their complaints about him and demanding that they retract their "false allegations." He said he was no longer working as an FHA

14

inspector; he was "pursuing" the matter "personally"; and he intended to seek criminal penalties for providing the "false engineer's report to obtain the refinance." He would also be filing "additional complaints with SCE to shut off power as a citizen." On August 18, defendant e-mailed numerous parties, stating he would file a criminal complaint with the HUD inspector general for "mortgage fraud."

On August 19, 2014, while Michele was away from home and at work, her husband Mark returned home around 10:30 a.m., after running errands, and found a green Land Rover parked in front of the home. A hatch was open that provided access to the crawl space beneath the home. Mark thought someone might be stealing copper. He saw a man whom he later identified as defendant[4] come out of the hatch, and he said to the man, " 'I'm the fucking homeowner. Who are you? What the fuck are you doing underneath my house?' "

Mark asked defendant for his identification and for whom he worked. Defendant said he worked for Edison, came out of the hatch, and began walking toward his vehicle. Mark then asked defendant for his supervisor's name and phone number. Defendant said he had that information in his vehicle, then he got into his vehicle and drove away. Mark punched the rear driver's side window of the vehicle out of frustration. Mark wrote down

---

[4] Mark had never seen defendant before and did not initially know that defendant was the man who came out of the hatch, but Mark realized that defendant was the man after he obtained the Land Rover's license plate number, the number was traced to defendant, and he identified defendant from a photo lineup. Mark also identified defendant in court as the man who came out of the hatch.

15

the vehicle's license plate number, called 911, and a sheriff's deputy arrived around 20 minutes later. Mark also called Michele and told her she needed to come home right away and that he had called the police.

A sheriff's deputy contacted Mark at the property. Mark was concerned for his family's safety. The deputy found a flashlight in the crawl space beneath the home. Michele was concerned that defendant had placed a bomb beneath the home, and the deputy called the bomb squad. No explosives were found.

Soon after defendant was on their property, Mark and Michele placed a fence in front of their home and filed for a civil restraining order against defendant. Mark had health problems, which were exacerbated by stress, and he became anxious and physically ill after Michele showed him some of defendant's e-mails. Mark had already seen defendant's July 23 e-mail in which defendant said he thought Mark and Michele " 'should die' " to teach others a lesson.

At 2:45 p.m., on August 19, 2014, defendant e-mailed Ingrid S. and copied numerous others, including Michele. The e-mail stated that, earlier that day, he "had a chance to make a site visit of the exterior of the building where [he] was physically assaulted by the homeowner and [his] car's window sustained damage because of the homeowner's wild and brutal attack." He said he now had "a complete knowledge of the subject property first hand," and he again asked Ingrid S. to withdraw her "completely fraudulent" report or he would include her in his "complaint" for "mortgage fraud."

On August 21, 2014, a San Bernardino County Sheriff's detective arrested defendant for extortion. The detective seized defendant's cell phone and two computer

16

towers and other items from defendant's home pursuant to a search warrant. In an interview, defendant initially denied he was at Michele's property, then he said he was on the property and opened the hatch but claimed he did not go underneath the house.

On August 28, 2014, defendant sent Ingrid S. a lengthy e-mail, with a copy to Michele, detailing his concerns with the property and Ingrid S.'s "fraudulent" report, and accusing Ingrid S. and William S. of numerous crimes and regulatory violations. In the same e-mail, defendant also said he had filed a complaint against Michele and Mark with the department of social services for the "willful endangerment of a minor," ostensibly their teenage daughter, due to the dangerous condition of the home, and he threatened to add Ingrid S. to his complaint if she did not retract her report.

On September 11, 2014, the San Bernardino County Superior Court issued a civil restraining order against defendant and in favor of Michele, Mark, and their teenage daughter. The order awarded Michele $770, comprised of $270 in court costs and $500 in attorney fees. The restraining order prohibited defendant from contacting Michele, Mark, or their daughter "directly or indirectly, in any way," including by telephone, e-mail, or text message. Defendant was personally served with the order. The order stated that "[p]eaceful written contact through a lawyer or process server, or other persons for service of legal papers related to a court case is allowed and does not violate this order."

On September 13, 2014, Michele was copied on an e-mail that defendant, or someone acting on his behalf, sent to her mortgage brokerage firm, stating that the firm owed him "offset costs incurred during the course of [his] contract" with the firm and that he intended to file a mechanic's lien against the property for those costs unless he was

17

paid those costs.  A preliminary notice of an intent to file a mechanic's lien for $10,655 against Michele's property was attached to the e-mail.

The September 13, 2014 preliminary notice stated that the $10,655 mechanic's lien was for "FHA Inspection and Verification of Site and Work Improvements" that defendant provided to the property.  The e-mail also included an itemized list of the $10,655 lien claim.  The list included the $770 in court costs and attorney fees that Michele was awarded for pursuing the civil restraining order, which defendant never paid, along with $250 in "court reporter's fee[s]," and $750 in "appellate court's filing and costs."

The list also included a "bail amount" of $3,500, "vehicle impound" of $350, "vehicle impound release" of $50, a $135 cab fare, and a total of $3,150 for "seized" equipment, namely two desktop towers with upgrades, a smartphone, and two business software discs.  The list further included $500 for the cost of a damaged wall and door that defendant attributed to "law enforcement break-in repair," $400 for "forced travel costs" to and from San Bernardino County, $300 for "legal research costs" and, finally, $500 for "miscellaneous."

2.  <u>The Two Mechanic's Liens Against the Property</u>

On November 6, 2014, defendant caused a $10,655 mechanic's lien to be recorded against the property.  He later filed an action in Los Angeles County to foreclose the lien. At the time of trial, from December 2018 to January 2019, the $10,655 lien was still on the property.

18

In 2016, Mark and Michele moved out of state to get away from defendant. In 2017, they filed for bankruptcy. On November 22, 2017, during the bankruptcy proceedings, defendant caused a second mechanic's lien for $150,000 to be recorded against the property.

3. Jarrod N.'s Testimony

In early 2015, Michele hired attorney Jarrod N. to remove the $10,655 mechanic's lien from the property, after defendant filed an action to foreclose the lien in Los Angeles County against Michele, Jason M.'s mortgage brokerage firm, and Michele's lender. Jarrod N. opined that the lien was invalid on its face because it was not based on work performed on real property.

The court in the Los Angeles County case granted Michele's lender's motion to change the venue to San Bernardino County, but defendant did not pay the fee to transfer the case to San Bernardino County. Jarrod N. also did not pay the fee because his strategy was to wait five years and move to dismiss the lien foreclosure action for failure to prosecute. As noted, the $10,655 mechanic's lien was still on the property at the time of trial. Michele and Mark could not afford to pursue an action to remove the lien.

In a December 11, 2015 letter to Jarrod N., defendant wrote that he was "now going to proceed with the rest of [his] criminal complaints" against Jarrod N. and his clients, and he advised Jarrod N. that he had posted three websites using the names of Jarrod N. and two other attorneys in Jarrod N.'s office. The letter then stated: "You should also be aware that as I think your clients [Mark and Michele] are somewhat related to San Bernardino County terrorist attack, I will be sending all the sites to the

19

media.  [¶]  *Your malicious clients have painted me as a Middle Eastern terrorist.  You are all about to learn a very valuable lesson in getting yourselves involved with Middle Eastern terrorism.*  [¶]  Today is absolutely your last chance.  There is no way in the world I am going to let you scoundrels get away with what you are doing.  I will not rest until justice is served against you corrupt, ruthless animals."  (Italics added.)  Jarrod N. understood the letter to be an implied threat to harm him and others, and he forwarded the letter to Michele and Mark.

On February 2, 2017, defendant e-mailed Jarrod N. and "all of" Jarrod N.'s neighbors at Jarrod N.'s high-rise office complex, stating that Jarrod N. and the others at his firm were "involved in and directly responsible for the events that led to" the December 2015 San Bernardino terrorist attack.  The e-mail further stated that the lawyers at Jarrod N.'s firm had "been repeatedly warned that conducting their terrorist activities out of that office could put the lives of the occupants of that complex in danger . . . .  [¶] . . . [W]e do not have any information as to any imminent attack on that building, but you should beware that we have been warned by various sources, including San Bernardino officials and agents of Mojahedin-e-Khalq terrorist group, that once we expose these criminals to the world, we should only expect more violence and San Bernardino style terrorist attacks . . . .  [S]hould there be any backlash from our exposé, either by extremist Islamists or by the San Bernardino mercenaries, we will hold the property managers and the occupants of that complex responsible for any outcome."

The February 2, 2017 e-mail "created a panic" in Jarrod N.'s office and with his neighbors, his landlord, and the police department.  Jarrod N. reported the matter to the

20

police, and it took him nearly a week to explain the matter to the landlord, his neighbors, and the police. The e-mail also disrupted Jarrod N.'s business "for at least several months." Jarrod N. opined that, in sending the e-mail, defendant intended to create a panic and problems for Jarrod N.

Jarrod N. sued defendant for defamation for posting defamatory websites about Jarrod N., his colleagues, and his law firm. On August 1, 2017, the judge in the defamation action issued a judgment in favor of Jarrod N., and defendant was ordered to take down defamatory websites he had posted about Jarrod N. and others. Defendant did not initially take down the defamatory websites; instead, he created more websites targeting Jarrod N. and his staff, including several young women who worked in Jarrod N.'s firm, calling them "whore[s]" and "all sorts of other really horrible things."

Defendant was found in contempt of the Los Angeles court order to take down the defamatory websites. In the fall of 2017, he removed some of the websites, but at his criminal trial in 2019, he still had active websites targeting Jarrod N., his colleagues, Michele, Mark, and others related to the 2014 transaction involving Michele's FHA loan. He continued to attack Jarrod N. and members of his firm, following the August 1, 2017 order and judgment in the defamation action.

On August 10, 2017, defendant e-mailed several Islamic centers, and sent copies to Jarrod N. and others in his firm, stating that the firm was responsible for the San Bernardino terrorist attack and that the firm was "now contemplating an attack in Orange County to implicate Muslims and stoke Islamophobia. [¶] It is incumbent on all Islamic organizations to prevent this corrupt and anti-Islam firm and its staff from their mission

21

or you could find yourselves targets of the movement against this law firm." The August 10 e-mail included a link to two websites indicating that Jarrod N. and members of his firm were "terrorists and neo-Nazis."

On August 17, 2017, defendant e-mailed Jarrod N., stating, "Not only I do not give in to extortion, I am going to teach you mother fucking extortionist piece of shit a lesson you will not forget for the rest of your short miserable life you mother fucking extortionist criminal Fascist Nazi piece of shit. . . . [¶] . . . [¶] I cannot be held responsible if one of those angry Muslims you are trying to have killed, kills you first you dumb mother fucking incompetent asshole." This e-mail also included links to websites targeting Jarrod N. and others. After receiving this e-mail, Jarrod N. was frightened for his safety and that of his staff, his family, and others.

B. *Defense Evidence*

Defendant called several witnesses and testified on his own behalf. He sought to show that numerous aspects of the property were in substandard condition and that numerous people who disagreed with his claims about the property were incompetent and had committed fraud in connection with the property.

1. Defense Witness Testimony

On July 16, 2014, the county responded to defendant's public records request for the property's permits. The manager of the county's building and safety division, John L., testified that these records showed that the property received an initial permit for a septic tank on November 20, 1987, and that the mobile home was "set down" on

22

November 24, 1987. At that time, the home still had wheels and was considered a vehicle.

On April 29, 1992, the home was placed on a permanent foundation and became real property. The foundation permit stated that the home was on piers and footings but did not specify the type of piers. Pursuant to state law, the county's copy of the foundation plans, which the county used to confirm that the foundation was installed in accordance with the plans, were destroyed after 90 days. Permits were issued for a patio cover in 2003 and a replacement septic tank in 2013, after the original septic tank failed.

Defendant called Ingrid S. and her assistant, William S., to testify. Ingrid S. stood by her report, which certified that the property's foundation met HUD requirements and that no structural modifications to the foundation, which were not in compliance with HUD requirements, were "known to exist." The scope of her work was limited to "the structural part" of the foundation, and she was not concerned with other aspects of the property. She confirmed that the home was on a " 'permanent' " foundation.

In July 2014, defendant contacted the county's code enforcement division and asked them to inspect the property for code violations. The county's chief code enforcement officer, Willis W., testified that defendant was making "broad-stroke claims that the property was in substandard condition," and that an inspection report for the foundation (Ingrid S.'s July 15, 2014 report) was fraudulent. On July 23, Willis W. e-mailed defendant that the county would not be inspecting the property for several reasons.

Willis W. explained the reasons. First, Willis W. was in receipt of a report "from a licensed professional (civil engineer)" (Ingrid S.) attesting that the foundation met HUD standards and that no structural modifications had been made to the foundation that would make it non-compliant with HUD requirements. Second, photos that defendant had "used to speculate" that some of aspects of the property were "out of compliance" did "not definitively establish" any code violations.

Third, the hot water heater was unlikely to explode as defendant claimed because the photos showed it had a thermo-pressure relief valve. Fourth, the owners had asked the county not to inspect the property, and Willis W. did not believe the county had grounds to obtain a warrant to enter the property for an inspection. Fifth, defendant was alleging that the property was in substandard condition without having been to the property, his services were terminated before they began, and he had written a series of "threatening and intimidating e-mails" after his services were terminated. In sum, Willis W. did not believe that defendant's claims about the property "were at all justified" or warranted a county inspection.

2. Defendant's Testimony

Defendant testified that he was not getting a fair trial. He had been "through" 14 attorneys and was representing himself because "every single one" of his attorneys had colluded with the prosecutor to deprive him of his rights. He was "thrown in jail" because he dared to challenge the county. His bail was revoked "based on the assumption" that he was a terrorist.

24

He testified that, on July 8, 2014, Adrian Q. called him and asked him to conduct a foundation inspection. He immediately saw two "red flags": (1) he was more than 100 miles away from the property; and (2) a foundation inspection is only needed for new construction or when there is a problem. He suspected that he was being used to gloss over "illegal activity" with Michele's refinance loan.

He received the $125,000 appraisal on July 9, 2014. The appraisal was "bogus" because it overvalued the property by $20,000 to allow more cash to be taken out of the home. The appraisal did not contain a "HUD plate" or "VIN" number for the home; it indicated that the HUD plate had been painted over. An appraisal cannot be completed without the property's identifying "HUD plate" number. The appraisal also indicated that the home was on a permanent foundation, which made defendant suspect there was a problem, since his work order had asked him to check whether the home had wheels. A lender would usually have an inspector inspect the property when there was a problem.

Defendant initially inspected the property based on the pictures contained in the appraisal, which showed extensive problems with the property. The home was a "death trap." Its foundation was "nothing": it consisted of a few cinder blocks and rusted "carjacks," resting in dirt.

There were other problems with the property. For example, the electrical system used flexible conduits; the electrical panel was ungrounded and likely to explode; the propane tank was improperly secured; the copper piping for the water heater was attached to steel, which would make the piping corrode; and the plumbing used toxic piping material. There were also no permits for the property's electrical, plumbing, or

25

mechanical systems, and no records showed that the property was inspected after its foundation was approved. The lack of permits alone should have "kill[ed]" Michele's refinance application, and homes with illegal work like Mark and Michele's had "exploded." But the county refused to inspect the property because it was corrupt, and HUD officials had no idea what they were doing. Jason M. also threatened to put defendant in jail.

On July 10, 2014, defendant told Adrian Q. that Adrian Q. needed to take care of the problems with the property, but Adrian Q. refused. Defendant thought the home needed $35,000 in repairs, and he proposed refinancing the home with a $35,000 cash-out "203K loan" designed to fix distressed properties. He did not have a financial incentive in proposing the alternative loan because his contractor's license had been inactive since 1998. He viewed his role as a consultant and not solely as a property inspector.

On July 11, 2014, defendant discussed the property's problems with Michele. He said her life was in danger due to the hazards in the home. He could get the contractor who installed the plumbing to fix the plumbing for free, but she refused, and he later suspected that Mark had done the plumbing. He also claimed he later discovered that William S. had installed the foundation and was involved in a "racket[]" with his brother to install faulty foundations.

Defendant attempted to alert authorities about the property's condition. He claimed the county's code enforcement division was prepared to conduct a full inspection until Ingrid S.'s foundation report found no problems. But Ingrid S. was not a structural engineer, the foundation had to be bolted down in order to comply with HUD guidelines,

and there was no record of this occurring. He claimed he later went to the home to protect his professional integrity, but Mark displayed a firearm and told him to leave, so he left. He believed he could go into uninhabited areas, as long as no one was present, if he was concerned about the property's safety. After he left the property, he sent an e-mail to "everyone" saying he was at the property.

After Michele applied for a civil restraining order, defendant's daughter served a 20-day preliminary notice of defendant's intent to file a mechanic's lien against the property. Defendant believed that the civil restraining order allowed him to send legal documents to Michele through a third party, and he later caused the $10,655 mechanic's lien to be recorded. He claimed the lien was valid because he was trying to improve the property, and the costs of his arrest and bail in this case were part of the costs of doing his job. He filed an action to foreclose the lien in Los Angeles County because he was located there and his contract to inspect the property was breached there.

During the current criminal proceedings, one of defendant's former attorneys told him that the charges would be dropped if he would remove the $10,655 mechanic's lien and pay attorney fees to Jarrod N.'s firm. But the San Bernardino terrorist attack then occurred, and he put up a website claiming that the San Bernardino County Sheriff's Department was responsible for the attack. He claimed he was told to remove the website or he would be charged with stalking, but he refused to remove the website, to release the mechanic's lien, and to pay the attorney fees. As a result, he was charged with stalking and additional crimes.

27

Defendant claimed he was only trying to do two things by becoming involved with Michele's property: protect taxpayer money, and protect lives and physical safety. His e-mail saying that Mark and Michele "should die" was intended to tell them that they were living in a "very dangerous house."

Defendant had previous experiences with fraud and corruption in the building and mortgage lending industries. While working as a property manager in the early 2000s, he knew that plumbing contractors and building inspectors were colluding to hide shoddy or unperformed plumbing work. After he tried to protect the property owners by enforcing the plumbing code, the plumbing contractors and the building inspectors "went after" him.

While later working as a building inspector for a bank, he knew that brokers were telling appraisers to "jack up the price[s]" of the homes in order to fatten the brokers' commissions. The bank retaliated against him, then fired him, after he refused to perpetuate the fraud. He then "took [the bank] down" by filing mechanic's liens against its properties and its customers' properties, but he released the liens after the FDIC took over the bank and asked him to release the liens. He first threatened the bank that he would file the liens unless the bank rehired him, and he threatened to file criminal complaints against several of the bank's employees.

He had also been involved in other disputes in which he had threatened people, accused them of fraud and other crimes, and filed mechanic's liens. In one dispute, he threatened to have a family living in Iran "tried in Islamic court for [the] death penalty."

28

He wrote that his "ultimate goal" was to have the family tried in Iran and " 'have them executed and post the pictures of their corpses on my website.' "

He claimed he did not extort people; he only made demands through legal processes. He also claimed he exercised his freedom of speech to create websites about people with whom he had disputes. He admitted he had impersonated other people "a hundred times." He forged one of his former attorney's signatures in filing a motion to dismiss the charges, and he forged his daughter's signature on a proof of service.

After Mark and Michele filed for bankruptcy in 2017, a realtor listed their home for sale on behalf of the bankruptcy court. Defendant told the bankruptcy court he would release his $10,655 mechanic's lien if Mark and Michele would tell the realtor about the many problems with the property. Because the prosecutor and Michele were not listening to him, in 2017 he caused to be recorded a second mechanic's lien for $150,000 against the property. He was owed "way more" than $150,000 for losses he had incurred in connection with this case.

## III.  DISCUSSION

A. *Substantial Evidence Supports Defendant's Convictions in Counts 1 through 5*

Defendant claims insufficient evidence supports each of his convictions in counts 1 through 5. We conclude substantial evidence supports each conviction.

In considering a claim that insufficient evidence supports a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—evidence that is reasonable in nature, credible, and of solid value, such that any rational trier of fact could have found the defendant guilty of

each element of the crime beyond a reasonable doubt.  (*People v. Johnson* (1980) 26 Cal.3d 557, 576.)  We presume, in support of the judgment, the existence of every fact the trier of fact could have reasonably inferred from the evidence (*ibid*.), bearing in mind that reasonable inferences may not be based on " 'suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work.' " (*People v. Morris* (1988) 46 Cal.3d 1, 21.)  Reversal for insufficient evidence is unwarranted unless it appears " 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Choi* (2021) 59 Cal.App.5th 753, 761.)

    1.  <u>Defendant's Stalking Conviction (§ 646.9, Count 1)</u>

Defendant was charged in count 1 with stalking Michele from July 11, 2014 to December 10, 2015.  (§ 646.9, subd. (a).)  To convict defendant of this crime, the prosecution had to prove that defendant willfully, maliciously, and repeatedly followed Michele, or willfully and maliciously harassed Michele, and made a *credible threat* with the intent to place Michele in *reasonable fear* for her safety or the safety of her immediate family.  (CALCRIM No. 1301.)

Defendant claims insufficient evidence shows that anything he did or communicated to Michele or to her attorney, Jarrod N., between July 11, 2014 and December 10, 2015, constituted a credible threat that placed Michele in reasonable fear for her safety or her family's safety.  He claims no reasonable person would have construed his actions and communications during that time frame as credible threats, such that no reasonable person would have been in fear for his or her safety, or for the safety of his or her family.  We disagree.

30

A " 'credible threat' means a verbal or written threat, including that performed through the use of an electronic communication device, or a threat implied by a pattern of conduct or a combination of verbal, written, or electronically communicated statements and conduct, made with the intent to place the person that is the target of the threat in reasonable fear for his or her safety or the safety of his or her family, and made with the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for his or her safety or the safety of his or her family. It is not necessary to prove that the defendant had the intent to actually carry out the threat." (§ 646.9, subd. (g); CALCRIM No. 1301.)

Substantial evidence shows defendant made numerous credible threats to Michele that actually caused her to reasonably fear for her safety or for the safety of her family, between July 11, 2014 and December 10, 2015. From his first contact with Michele, on July 11, 2014, defendant was "very aggressive," "hostile and bullying." He told her she needed to "get" her broker to "understand" that she needed a more comprehensive property inspection. That day, he was also threatening Adrian Q. that he would "do [his] best" to stop Michele's loan application, unless Adrian Q. ordered the inspection.

Defendant then made a series of threats that, taken together, reasonably placed Michele in fear for her safety and the safety of her family. On July 14, 2014, he texted Michele that she should e-mail or call him before he filed criminal complaints, which could "put" her "behind bars." Around 10 p.m., on July 14, he posted a "CrimeReports.online" webpage, containing Michele's contact information and alleging she had committed crimes.

31

On July 15, 2014, defendant threatened to place a mechanic's lien on the property for his $200 inspection fee and "additional legal fees," unless he was paid $200 for the inspection he did not perform. On July 16, after he was paid the $200, he told Michele she would be in trouble with federal, state, and local authorities, unless she "listened" to his "advice" and cooperated with his plan to fix the many problems with her property. On July 23-24, he began challenging Ingrid S.'s July 15 foundation report, calling it "criminally fraudulent" and accusing Michele and others of "collusion to commit fraud."

Then, on July 26, he e-mailed Ingrid S. and sent a copy to Michele, saying, "*This . . . house is a death trap. If the owners are so stupid that they do not care for their own safety, I think they should die to teach a lesson to others . . . .*" (Italics added.) Michele testified that the July 26 e-mail made her even more fearful of defendant and what he might do. Before July 26, he was threatening Michele and others, but he was not saying that she and her husband Mark should "die in the house." Defendant continued to harass and threaten Michele after July 26. In August, he tried to have the water and power to the property shut off. Pretending to be Ali Fardi, he also began attacking the water district's general manager, Don B., and its board members.

Given defendant's repeated and continuing threats to sue Michele, her broker, and others if they did not cooperate with his demands to fix the property, and his obsession with the property, the jury could have reasonably inferred that defendant's July 26, 2014 e-mail constituted a credible threat to kill or physically injure Michele and Mark. (§ 646.9, subd. (g).) That is, the jury could have reasonably inferred that defendant intended the July 26 e-mail to place Michele in reasonable fear for her and Mark's safety,

32

and that defendant had the "apparent ability to carry out" the threat "so as to cause" Michele and Mark to reasonably fear for their safety. (*Ibid*.) The jury could have reasonably inferred that defendant was so obsessed with the property, and so angry with Michele and others for failing to cooperate with him, that he was willing to cause physical harm to Michele and Mark. No evidence showed that defendant was unable to carry out the threat to kill or cause physical harm to Mark and Michele. (*Ibid*.)

Defendant compounded the credibility of his July 23, 2014 e-mail threat when, on the morning of August 19, Mark came home to find defendant in the crawl space beneath the property. Michele feared that defendant had placed a bomb or another device beneath the home. In sum, the jury could have reasonably inferred that defendant's act of going to the property, following his attempts to have the water and power to the property turned off, his July 23 e-mail, and the many other threats he communicated to Michele, reasonably placed Michele and Mark in fear for their safety and the safety of their family.

Defendant argues that his July 23, 2014 e-mail and his presence on the property on August 19, 2014, "fail to establish that Michele had a reasonable fear of harm." He claims no reasonable person could interpret his July 23, 2014 e-mail as a threat because the e-mail indicated that the home was "especially susceptible to an earthquake," and defendant was being "responsible to intervene." He also points out that he went to the property on August 19 to inspect it, not to harm anyone, and he did not injure Mark or harm the property. He believed the law allowed him to examine the home's exterior for safety concerns. Thus, he argues, no reasonable person would have believed that his

33

August 19 visit to the property was "intended to cause harm." He also argues that his "investigations into dangerous building conditions and fraud [were] lawful activities."

All of these arguments are unavailing because they rely on inferences that the jury could have reasonably rejected in light of the record as a whole. The jury could have reasonably discredited defendant's claim that all of his actions and communications concerning Michele and her property were lawful because he was only "inten[ding] on proving that her home was in a dangerous and unlawful condition." Based on all of defendant's actions and communications between July 11, 2014 and December 10, 2015, the jury could have reasonably inferred that defendant intended, and that Michele reasonably understood, defendant's many threatening communications as threats to harm Michele and members of her family. (§ 646.9, subd. (g).) Defendant's credible threat is amply demonstrated by his pattern of conduct. Thus, substantial evidence supports the credible threat element of defendant's stalking conviction. (*Ibid*.)

2. Defendant's Extortion Conviction (§§ 518, 519, Count 2)

Defendant was charged in count 2 with extorting Michele for money and other property on or about July 14, 2014. (§§ 518, 519.)

The jury was instructed that, to prove this crime, the People had to prove: (1) defendant threatened to unlawfully injure the property of another person, or threatened to accuse another person of a crime; (2) when making the threat, defendant intended to use that fear to obtain the other person's consent to give him the money or property; and (3) as a result of the threat, the other person then gave defendant money or property. (CALCRIM No. 1830.)

34

The instruction reflected the elements of extortion: "(1) A wrongful use of force or fear, (2) with the specific intent of inducing the victim to consent to the defendant's obtaining [the victim's] property, (3) which does, in fact, induce such consent and results in the defendant's obtaining property from the victim." (*People v. He1sslink* (1985) 167 Cal.App.3d 781, 789.) "Fear, such as will constitute extortion, may be induced by a threat . . . [¶] . . . [t]o do an unlawful injury to the person or property of the individual threatened . . . [¶] [or] . . . [t]o accuse the individual threatened . . . of a crime." (§ 519.)

" ' In order to establish extortion, "the wrongful use of force or fear must be the operating or controlling cause compelling the victim's consent to surrender the thing to the extortionist." ' " (*People v. Bollaert* (2016) 248 Cal.App.4th 699, 725.) The threat that constitutes extortion may be implied from all of the circumstances. (*Ibid*.) Extortion is a specific intent crime; thus, "guilt depends on the intent of the person who makes the threat and not the effect the threat has on the victim." (*Id*. at p. 726.)

Defendant claims insufficient evidence shows he wrongfully used force or fear to obtain the $200 payment from Michele, either by (1) threatening to unlawfully injure Michele's property by filing an *unlawful* mechanic's lien against it, or by (2) threatening to accuse Michele of a crime. (§ 519; CALCRIM No. 1830.) Thus, he challenges the first element—the wrongful use of force or fear element—of his extortion conviction.

On July 15, 2014, defendant e-mailed Michele, stating, "Please pay the attached invoice immediately to avoid additional legal fees." An invoice for $200 was attached to the July 15 e-mail, and the invoice stated that a mechanic's lien would be recorded

against Michele's property and additional fees would be charged unless the invoice was paid.

Defendant argues that his July 15, 2014 e-mail did not satisfy the "wrongful use of force or fear" element of his extortion conviction. He claims the July 15 e-mail did not threaten to accuse Michele of a crime unless she paid the invoice. (§ 519.) In addition, before he sent the July 15 e-mail and the $200 invoice, he unequivocally told Michele that he had *already* reported her and others to authorities for crimes she and others had committed. Thus, he argues, he was not "hanging a threat" of accusing Michele of a crime to induce her to pay the $200 invoice.[5]

Substantial evidence shows, however, that defendant was continuing to "hang a threat" to further accuse Michele of crimes, and to further publicize his accusations, unless she paid the $200 invoice. Between July 11 and July 14, 2014, defendant repeatedly threatened to accuse Michele, Adrian Q., and Jason M. of crimes *unless* they cooperated with him by allowing him to (1) inspect the property, ostensibly for the $200 inspection fee; and (2) fix the property, with a $35,000 cash-out refinance loan. The jury could have reasonably inferred that defendant's July 11 to July 14, 2014 threats to accuse Michele of crimes *implicitly continued* in his July 15 demand for payment of his $200

_____

[5] Defendant also argues that his July 15 e-mail did not constitute "an unlawful threat to injure" Michele's property (§ 519) because he had probable cause to file a mechanic's lien if his $200 invoice was not paid. (*Ibid*.) It is unnecessary to address this argument, in light of the substantial evidence that defendant wrongfully threatened to accuse Michele of crimes unless she paid his $200 invoice. (§ 519.)

invoice. That is, he would continue to accuse Michele of crimes, and he would continue to publicize these accusations, unless she paid the invoice.

The evidence shows that, on July 11, 2014, shortly after Adrian Q. canceled defendant's inspection, defendant called Michele and told her she needed to "get" her broker to "understand" that she needed a more comprehensive inspection. Defendant was "very aggressive," "hostile and bullying" during the call. He then e-mailed Adrian Q. at 2:13 p.m., on July 11, stating, "Please be advised that unless you order an inspection of the property before 4:00 p.m. today, I will start legal proceedings against you, the lender, and the borrower for fraud upon government and endangerment of the public." This July 11 threat to "start legal proceedings" "for fraud upon the government and endangerment of the public" was tantamount to threatening to accuse Michele and others of crimes, *unless* his inspection services were ordered *and* he was paid his $200 inspection fee. (§ 519.)

Defendant's extortionist threats continued after his July 11, 2014 e-mail to Adrian Q. After he sent the July 11 e-mail, he called Michele at 2:16 p.m., on July 11, telling her that her broker had canceled the inspection but she was still responsible for ordering an inspection, and *she would be subjected to fines and fees and be reported to federal and state authorities* if she did not order an inspection. In a subsequent, 3:15 p.m. call to Michele, defendant left a message that he would file *criminal charges* against Michele unless she ordered the inspection before 4:00 p.m. that day. No inspection was ordered on July 11.

37

On July 12, 2014, defendant e-mailed Adrian Q., saying, among other things, that he had "completed" his "task," his fees were "due," and he would invoice Michele, put a lien on her property, and sue her in civil court unless she paid his fees. Defendant also spoke with Jason M. on July 12 and threatened to "prosecute" him "to the fullest extent of the law" unless he agreed to recommend the 203k loan with the $35,000 cash-out for property repairs. On July 14, defendant texted Michele that he had filed four administrative complaints against her and that she should contact him before he *filed criminal complaints* against her, which could "put" her "behind bars." This e-mail also threatened to accuse Michele of crimes unless she (1) allowed him to inspect the property, ostensibly for the inspection fee, and (2) allowed him to fix the property, with a $35,000 cash-out refinance.

Also on July 14, 2014, defendant sent Michele two inspection reports, noting "extensive life and safety issues" with the property (the July 11 report), and that the "owners" and others had refused to provide "entry for inspection of life and safety issues" (the July 14 report). The reports thus suggested, and threatened to publicize to others, that Michele was committing crimes. On July 14, defendant also posted an online report and a webpage, one implying, and the other expressly alleging, that Michele was committing crimes.

Against this background, defendant e-mailed Michele at 7:36 a.m., on July 15, 2014, with his $200 invoice, saying he would claim additional charges and file a mechanic's lien against her property unless the invoice was paid. Although the July 15 e-mail did not itself threaten to accuse Michele of crimes, the jury could have reasonably

38

inferred that defendant's July 11 to July 14 threats to accuse Michele of crimes, unless she ordered the inspection and otherwise cooperated with him, *were continuing and implicit* in his July 15 e-mail demanding payment of the $200 invoice. That is, defendant would *continue* to accuse Michele of crimes, and would further publicize his accusation to numerous people, unless she paid the invoice.

Defendant points out that his 5:47 p.m., July 14, 2014 e-mail to Jason M. "unequivocally stated" that he had already filed "criminal complaint[s]" against the borrowers, Adrian Q., and Jason M. "for threats and blackmail with local jurisdictions." But this July 14 e-mail did not necessarily mean that defendant would *no longer* threaten to accuse Michele of crimes unless she cooperated with him, including by paying his $200 fee. Based on the entire record, including defendant's previous threats, the jury could have reasonably inferred that defendant would *continue* to threaten to accuse Michele and others of crimes, and that defendant would *further* publicize his allegations against Michele and others, *unless* Michele paid his $200 invoice as he demanded in his July 15 e-mail.

As discussed, defendant threatened to accuse Michele of crimes in his July 11 to July 14 communications unless she cooperated with him, and his threats were escalating. Michele testified that she paid the $200 invoice, not because defendant had done any work or was owed any money, but because he was threatening her and she wanted him to "go away." In sum, substantial evidence shows that defendant extorted the $200 payment from Michele by implying that he would *continue* to threaten to accuse her of crimes and

39

would *further* publicize his criminal accusations against her unless she paid him the $200. (§ 519.)

    3.  <u>Extortion with a Threatening Letter (§ 523, Count 3)</u>

Defendant was charged in count 3 with extorting Michele by sending her a threatening letter on or about September 13, 2014. (§§ 519, 523.)

The jury was instructed that, to prove this crime, the People had to prove (1) defendant sent or delivered a threatening letter or other writing to another person; (2) in the letter or writing, defendant *threatened to unlawfully injure the other person or the property of the other person*; and (3) when sending or delivering the letter or writing, defendant intended to use fear to obtain money or property with the other person's consent. (§§ 519, 523; CALCRIM No. 1831.)

The evidence shows that, on September 13, 2014, Michele received a copy of a letter that defendant, or someone acting on his behalf, sent to her mortgage brokerage firm, stating that the firm owed him "offset costs incurred during the course of his contract" with the firm, and that he intended to file a mechanic's lien against Michele's property for the $10,655 sum unless he was paid that sum. A preliminary notice of an intent to file a mechanic's lien for $10,655 against Michele's property was attached to the e-mail.

The preliminary notice stated that the $10,655 sum was for an "FHA inspection" and "verification of site and work improvements," and included an itemized list of the $10,655 claim. The list included the $770 in court costs and attorney fees that Michele was awarded for pursuing the September 11, 2014 civil restraining order, which $770

40

sum defendant never paid. The rest of the $10,655 claim was comprised of costs defendant claimed he incurred in connection with the September 11, 2014 civil restraining order and his August 21, 2014 arrest for extortion.

Defendant claims that the September 13, 2014 letter was not a threat to *unlawfully injure* Michele's property (§§ 519, 523) because he had "probable cause" to record a $10,655 mechanic's lien against her property. Relying on *Jarrow Formulas*, *Inc. v. LaMarche* (2003) 31 Cal.4th 728 (*Jarrow*), he argues that whether his mechanic's lien "theory" would prevail in civil court is "beside the point" because evidence that a civil action may fail on its merits is not evidence that filing and serving the civil complaint is unlawful. (See *id*. at p. 743 ["[A]n action that ultimately proves nonmeritorious may have been brought with probable cause."].) He also points out that, "[c]ounsel and their clients have a right to present issues that are arguably correct, even if it is extremely unlikely that they will win . . . ." (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650.)

This argument disregards the standard of review. Notwithstanding defendant's claim that his $10,655 mechanic's lien claim was legal and in good faith, the jury could have reasonably credited Jarrod N.'s testimony that the entire $10,655 mechanic's lien was "invalid on its face" because none of the $10,655 amount was for work or services performed on Michele's real property. (See Civ. Code, § 8400 et seq.) The jury also could have reasonably inferred that defendant's September 13, 2014 letter to Michele, demanding payment of the $10,655 sum under the threat of recording a $10,655 mechanic's lien against her property, was a threat to *unlawfully injure* her property unless

41

he was paid the $10,655. (§§ 519, 523.) Thus, substantial evidence supports defendant's conviction in count 3 for extortion by a threatening letter. (§§ 519, 523)

4. Violating the Civil Restraining Order (§ 166, subd. (a)(4), Count 4)

Defendant was charged in count 4 with violating the September 11, 2014 civil restraining order, a misdemeanor. (§ 166, subd. (a)(4).) The prosecutor argued that defendant violated the restraining order by sending Michele the September 13, 2014 letter, threatening to file a $10,655 mechanic's lien against her property unless he was paid the $10,655 sum. The proof of service of the preliminary notice, which was attached to the September 13 letter, along with the preliminary notice, was signed by Daalina Dinaali on September 13.

The jury was instructed, that to prove count 4, the People had to prove, among other things, that defendant *willfully* violated the September 11 civil restraining order by sending Michele the September 13 letter. (See CALCRIM No. 2700.) The jury was further instructed that an act is committed willfully when it is committed "willingly or on purpose." (*Ibid*.)

Defendant argues that, in testifying at trial, Michele "speculated" that defendant was the person who sent Michele the September 13, 2014 letter and preliminary notice, or that he directed someone to do so on his behalf. He points out that, in a prior declaration, Michele stated that defendant's wife sent the e-mail. Thus, he argues, insufficient evidence shows he violated the September 11 order because insufficient evidence shows he directed "Daalina Dinaali" to sign the proof of service and send the preliminary notice and September 13 letter to Michele. This argument is completely unavailing. The record

42

shows that *defendant signed* the September 13, 2014 letter, demanding payment of the $10,655 sum, to which the preliminary notice and proof of service were attached.  The record also shows that Michele was not speculating, but reasonably inferring, based upon the content of the letter and her on-going dispute with the defendant, that defendant either sent the letter and preliminary notice to her, or directed one "Daalina Dinalli"—a person ostensibly related to defendant—to sign the proof of service and send the September 13 letter and preliminary notice to Michele.

Defendant alternatively argues he did not violate the September 11, 2014 restraining order by sending, or causing another person to send, the September 13 letter and preliminary notice, because the order provided that " 'peaceful written contact through a lawyer or process server, or other person for service of legal papers related to a court case is allowed and does not violate this order.' "  He argues his September 13 letter and preliminary notice were "in compliance with the exception for peaceful written service of a court document."

But substantial evidence shows, and the jury could have reasonably inferred, that defendant had no lawful basis for demanding that Michele pay him any part of the $10,655 sum on September 13, 2014, and no lawful basis for filing a mechanic's lien for the $10,655 sum, at any time.  No part of the $10,655 sum was for a work of improvement on Michele's property.  (Civ. Code, § 8400 et seq.)  Rather, the entire $10,655 sum was for costs defendant incurred in connection with the September 11 civil restraining order and his August 21 arrest for extortion.

43

Thus, the jury could have reasonably inferred that defendant had no lawful basis for demanding any part of the $10,655 sum, and that he sent the September 13 letter and preliminary notice to Michele as a means of continuing to harass her. Thus, substantial evidence shows that defendant violated the September 11 civil restraining order by sending Michele the September 13 letter and preliminary notice.

5. Filing a False Mechanic's Lien (§ 115, subd. (a), Count 5)

Defendant was charged in count 5 with procuring and offering a false or forged instrument, a felony (§ 115, subd. (a)), on November 6, 2014. The record shows that, on November 6, defendant caused the $10,655 mechanic's lien to be recorded against Michele's property. The jury was instructed that, to prove count 5, the People had to prove (1) defendant caused a false document to be recorded in a public office in California; (2) when defendant did that act, he knew that the document was false; and (3) the document was one that, if genuine, could be legally filed or recorded. (CALCRIM No. 1945; § 115, subd. (a).) "[S]ection 115 was designed to prevent the recordation of spurious documents knowingly offered for record." (*Generes v. Justice Court* (1980) 106 Cal.App.3d 678, 681-682.)

Defendant does not dispute that he caused the $10,655 mechanic's lien to be recorded on November 6, 2014. He argues, however, that insufficient evidence shows that the lien was false. Again, he argues that a claim can be lawful, or made in good faith, even though it ultimately fails on its merits. (See *Jarrow*, *supra*, 31 Cal.4th at p. 743.) Again, however, substantial evidence shows that the entire $10,655 mechanic's lien was false—it was "invalid on its face"—because none of it represented work

44

performed to improve Michele's property. (Civ. Code, § 8400 et seq.) Thus, the jury could have reasonably inferred that defendant knew the lien was false when he caused it to be recorded on November 6. Accordingly, substantial evidence supports defendant's conviction in count 5.

**B. *No Unanimity Instructions Were Required To Be Given on Counts 2 and 5***

Defendant claims the trial court prejudicially erred in failing to give unanimity instructions, sua sponte, on counts 2 and 5. We find no error.

1. Applicable Legal Principles

In criminal cases, the jury must unanimously agree that the defendant committed a specific crime. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) Thus, "when the evidence suggests" that more than one discreet crime was committed, "either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act. [Citations.] [¶] This requirement of unanimity as to the criminal act 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.' [Citations.] . . . [¶] On the other hand, where the evidence shows only a single discreet crime but leaves room for disagreement as to exactly how that crime was committed . . . the jury need not unanimously agree on the basis or, as the cases often put it, the 'theory' whereby the defendant is guilty." (*Ibid.*) "Thus, the unanimity instruction is appropriate 'when conviction on a single count could be based on two or more discrete criminal events,' but not 'where multiple theories or acts may form the basis of a guilty verdict on

45

one discrete criminal event.' " (*Id.* at p. 1135; see *People v. Hernandez* (2013) 217 Cal.App.4th 559, 569.)**6**

   2.  No Unanimity Instruction Was Required to be Given on Count 2 (Extortion)

In count 2, defendant was charged with extorting Michele by extorting "money and other property . . . by means of force and threat, such as mentioned in section 519," on or about July 14, 2014.  Following the close of the evidence, the jury was instructed that all of the crimes allegedly occurred between July 11, 2014 and December 10, 2015.

Extortion is the obtaining of property or other consideration—anything of value— from another person with that person's consent.  (§ 518.)  To prove count 2, "extortion by threat," the jury was instructed that the People had to prove (1) defendant threatened to unlawfully injure the property of another person, or threatened to accuse another person of a crime; (2) when making the threat, defendant intended to use "that fear" (of unlawful injury or criminal accusation) to obtain the other person's property; and (3) as a result of the threat, the other person consented to give, then gave, the defendant money or property.  Consent for extortion can be "coerced or unwilling," as long as it is given as a result of the wrongful use of force or fear.  (CALCRIM No. 1830.)

_____

**6**  The unanimity pattern instruction, CALCRIM No. 3500, states:  "The defendant is charged with _____ <insert description of alleged offense> [in Count __ ][sometime during the period of _____ to _____ ].  [¶]  The People have presented evidence of more than one act to prove that the defendant committed this offense.  You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act (he/she) committed."

46

In his closing argument, the prosecutor did not argue that count 2 was based on a single letter or e-mail that defendant sent to Michele. Rather, he argued defendant committed extortion, as charged in count 2, by (1) threatening to accuse Michele of a crime—to file criminal complaints and "put [her] behind bars," and by (2) threatening to place unlawful mechanic's liens against her property, unless she paid him $200 for the canceled property inspection he did not perform. The prosecutor argued, "not only did he threaten to unlawfully injure the property to get money, but he also threatened to accuse them of crimes to get the money . . . ."

As defendant points out, the evidence shows he sent multiple letters and e-mails to Michele—between July 11 and July 14, 2014—in which he threatened to accuse her of crimes *and* threatened to file a mechanic's lien against her property unless she paid him $200 for the canceled inspection. Given that he made "many calls" and sent "many e-mails," he argues, "some jurors may have disagreed about whether a particular call or e-mail threatened criminal prosecution or contained an unlawful threat to property." Thus, he argues, without a unanimity instruction, or "an election tying a specific communication to the charge, the jury may not have unanimously agreed that any particular message constituted the threatening letter or writing required for a section 523 conviction."

We conclude that no unanimity instruction was required to be given on count 2, by the court sua sponte, because the evidence did not suggest that defendant committed *more than one discrete crime* of extortion by threat. (*People v. Russo*, *supra*, 25 Cal.4th at p. 1132.) Rather, the evidence showed he committed *only one* crime of extortion by

47

threat: he extorted $200 from Michele by *continually* threatening her, in writing between July 11 and July 15, 2014, to continue to accuse her of crimes, and to continue to publicize his accusations, unless he was paid the $200. (§§ 518, 519, 523.)

To be sure, the evidence left room for disagreement among the jurors as to *exactly how* defendant committed the crime: either he extorted Michele of the $200 by threatening to accuse her of crimes, or he extorted her of the $200 by threatening to injure her property by filing an unlawful mechanic's lien against it. (*People v. Russo*, *supra*, 25 Cal.4th at pp. 1132, 1135.) But the jury was not required to agree on whether defendant threatened to accuse Michele of crimes *or* threatened to injure her property; it was only required to unanimously agree that defendant made *either* of these threats. (*Id.* at p. 1135.) Thus, the court did not have a duty to instruct the jury sua sponte that it had to unanimously agree on exactly how, or by which particular communication, defendant unlawfully threatened Michele unless she paid him $200.

3. <u>No Unanimity Instruction Was Required for Count 5 (Filing False Document)</u>

As discussed, defendant was charged in count 5 with offering a false document for filing in a public office within California (§ 115, subd. (a)), namely, the mechanic's lien for $10,655 he caused to be filed against Michele's property on November 6, 2014. The jury was instructed that, to prove this crime, the People had to prove defendant (1) caused a false document to be filed or recorded in a public office in California; (2) when defendant did this, he knew the document was false, and (3) if genuine, the document could legally be filed or recorded. (CALCRIM No. 1945.)

48

Defendant points out that, although count 5 was based on the $10,655 mechanic's lien that he caused to be filed against Michele's property on November 6, 2014, during closing argument the prosecutor *mentioned* the mechanic's lien he caused to be filed against Michele's property, in 2017, for $150,000. Thus, he argues, "some jurors may have disagreed on which lien was a false document." That is, some jurors may have believed he was "entitled to the costs associated with his work in the first lien," and others may have "thought the second lien was valid," given that, by 2017, he had learned that an entity associated with William S. had installed and approved the foundation.

This argument, too, is unavailing, for at least two reasons. First, the prosecutor relied on the 2014 mechanic's lien as the basis of the charge in count 5, not the 2017 mechanic's lien. The prosecutor *mentioned* the 2017 mechanic's lien in his closing argument, not as the basis of the charge in count 5, but in arguing that defendant had *continually* harassed Michele for years, including in 2017, for purposes of the harassment element of the stalking charge in count 1. (§ 646.9, subd. (a).) Second, the jury was instructed that all of the crimes allegedly occurred between July 11, 2014 and December 10, 2015. This time frame prohibited the jury from considering the 2017 mechanic's lien as the basis for count 5.

In sum, the prosecutor relied on the November 6, 2014 mechanic's lien as the basis for the charge in count 5, and the instructions prohibited the jury from basing its conviction in count 5 on the 2017 mechanic's lien. For these reasons, the court did not have a duty to give a unanimity instruction sua sponte on count 5.

49

C. *The* Marsden *Motion to Remove Attorney Peter S. Was Properly Denied*

Defendant claims the trial court erroneously denied his posttrial *Marsden* motion to relieve his appointed counsel, Peter S., and to appoint another attorney to represent him in posttrial proceedings, including for the purposes of filing a motion for a new trial and representing defendant at sentencing. Defendant claims Peter S. had a conflict of interest in representing him. We conclude that the court did not abuse its discretion in denying defendant's *Marsden* motion to relieve Peter S.

1. Relevant Background

When the court denied defendant's *Marsden* motion to relieve Peter S. on June 28, 2019, defendant had previously been represented by numerous court-appointed and private attorneys. To place the motion in perspective, we summarize the lengthy background preceding the denial of the motion.

The complaint was filed in April 2015. The court appointed the public defender to represent defendant at his arraignment on August 20, 2015. On October 5, 2015, the date of the preliminary hearing, the court denied defendant's *Marsden* motion to relieve deputy public defender Phillip Z. In January 2016, another deputy public defender, Mark B., began representing defendant.

On May 3, 2016, defendant filed a *Marsden* motion to relieve Mark B. He claimed Mark B. had a conflict of interest in representing him because he was pursuing "criminal police reports and administrative charges" against Mark B., with law enforcement agencies and the State Bar of California, for several offenses including "dereliction of duties." Defendant admitted having posted "websites exposing the

50

incompetence and negligence" of Mark B. and Phillip Z.  He was pursuing "similar complaints" against supervising public defender, Rasheed A., and the public defender, Phyllis M., and had been "prompted . . . to publish additional websites" concerning Rasheed A. and Phyllis M. after they ignored his e-mails.

On May 5, 2016, the public defender's office declared a conflict of interest in representing defendant and was relieved as his counsel.  That day, the court appointed the conflict panel to represent defendant.  On October 13, 2016, Scott B., from the conflict panel, declared a conflict of interest.  On October 19, 2016, Stuart O., from the conflict panel, began representing defendant.  On November 21, 2016, defendant told the court that he did not want "this attorney," Stuart O., to represent him.  The court held a *Marsden* hearing and denied defendant's motion to relieve Stuart O.

On February 22, 2017, defendant told the court he wished to represent himself, the court granted defendant's *Faretta*[7] motion, and relieved the conflict panel.  The court vacated the February 27 preliminary hearing date and reset the preliminary hearing on March 13.  On March 2, a first amended felony complaint was filed, and defendant pled not guilty to the charges on March 9.  On March 9, the prosecutor told the court that defendant had been sending him e-mails and letters, threatening criminal and administrative proceedings against the prosecutor personally and the district attorney's office.  Based on defendant's threats, the prosecutor told the court, and the court agreed,

---

[7]  *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).

51

that the prosecutor would no longer communicate with defendant except in court and on the record.

On March 13, 2017, defendant asked the court to appoint counsel for him. The court reappointed Stuart O. from the conflict panel and continued the preliminary hearing to March 16. On March 16, defendant asked the court to continue the preliminary hearing again so he could hire private counsel. The court denied defendant's continuance request and proceeded with the preliminary hearing. Defendant was held to answer, and an information was filed on March 21.

At his March 24, 2017 arraignment, defendant asked the court to continue the matter so he could hire private counsel. The court continued the arraignment to May 5 and, on that day, defendant appeared with a private attorney, Christopher K., and pled not guilty. On July 28, 2017, Christopher K. asked to be relieved. The court relieved Christopher K. and granted defendant's request to continue the matter, once again, so defendant could seek new counsel, but the court limited the continuance to 30 days.

On September 1, 2017, defendant hired a second private attorney, Eugene C., and another attorney specially appeared for Eugene C. The specially appearing attorney told the court that Eugene C. had been hired only for the "specific purpose" of filing a section 995 motion. On the next court date, October 6, Eugene C. asked to be relieved as counsel, and his request was granted. Defendant told the court he wanted to hire yet another private attorney, and the court continued the matter to October 13. On October 13, defendant was granted an additional two-week continuance to find another private attorney.

On October 27, 2017, private attorney George W., defendant's third private attorney, specially appeared for defendant and explained that defendant had only hired him to file a section 995 motion. The court asked whether defendant was planning to represent himself in the case, including at trial, with George W. assisting him in filing a section 995 motion. Defendant said he did not wish to represent himself and claimed George W. had agreed to represent him at trial if the section 995 motion was denied. The court set a November 17 hearing date for the section 995 motion.

On November 17, 2017, the court relieved George W. and granted defendant yet another continuance to find private counsel. The court struck a section 995 motion that defendant filed on November 2 because defendant falsely used George W.'s name and state bar number in filing the motion.

In court, on November 17, George W. confirmed that he did not file the motion, and defendant admitted that he filed the motion, falsely using George W.'s name and state bar number. Meanwhile, on November 14, 2017, the prosecutor filed a motion to revoke defendant's bail and remand him into custody. On November 17, the court set a December 1 hearing date on that motion.

On December 1, 2017, defendant had not hired another private attorney, so the court appointed Robert P. to represent defendant. Robert P. was a former member of the conflict panel. After Robert P. was appointed, defendant complained that he still wanted to hire a private attorney and wanted more time to do so. The prosecutor urged the court not to grant defendant any further continuances and to proceed with the motion to revoke defendant's bail.

The prosecutor claimed that defendant's bail should be revoked because he posed an extreme danger to the public: he had defamed and threatened all of his prior attorneys, Michele, other witnesses, other people involved in the case, and people associated with people involved in the case. He had also posted defamatory websites about his prior attorneys, the prosecutor, others involved in the case, and people associated with them. For example, after Eugene C. was relieved as counsel, defendant posted a website stating that Eugene C. was a "white-collar criminal" and a "fraudulent and corrupt and malicious" attorney who was "part of a scheme responsible for the current wave of Islamophobia caused by" the San Bernardino County terrorist attack. Defendant had also violated court orders not to threaten people and not to contact anyone involved in the case except through counsel—conditions of his continued release on bail.

The court continued the hearing on the bail revocation motion to December 4, 2017, and gave defendant until then to hire private counsel. The hearing was later continued to December 5. On December 5, defendant, Robert P., and a private attorney, Eric A. appeared in court. Eric A. told the court that he had spoken with defendant the day before, had read documents defendant had given him, and had concluded he could not represent defendant. Defendant told the court that Eric A. could not represent him because Eric A. was on the conflict panel, and he needed more time to find an attorney. Eric A. asked the court to order defendant not to "create websites" with Eric A.'s "name on them," and the court made that order. The court also struck, as "completely unfounded," an affidavit of prejudice defendant filed to disqualify the judge who was scheduled to hear the motion to revoke his bail. (Code Civ. Proc., § 170.1.)

54

At this point, Robert P. was still defendant's attorney. The court ordered defendant not to file any motions while he was represented by counsel and proceeded with the motion to revoke defendant's bail. Robert P. told the court he was not ready to proceed on the motion, both because he had not had the time to prepare and because his only conversations with defendant had been that defendant wanted to hire a private attorney. Robert P. urged the court to give defendant additional time to hire an attorney.

The prosecutor objected to any further continuances of the bail revocation hearing, and told the court that, on November 17, 2017, defendant filed a "malicious $150,000" mechanic's lien against Michele's property, ostensibly to prevent the property from being sold. Defendant had also recently threatened to report Michele's *realtor*, who was listing her property for sale, to "the Bureau of Real Estate for False Advertising" and for crimes, in violation of the court orders not to contact people involved in the case except through counsel. The realtor's family was "in extreme fear." Defendant was also continuing to threaten, harass, and defame numerous other people.

The court continued the bail revocation hearing to December 22, 2017, after defendant told the court he would be prepared to defend the motion, without counsel, if he could not hire an attorney before December 22. On December 8, defendant filed a motion to recuse the San Bernardino County District Attorney and for sanctions against the district attorney and defense attorneys, claiming his prior attorneys had all "colluded" with the prosecutor.

On December 22, 2017, defendant, Robert P., and a private attorney, Ken B., appeared in court. Ken B. said he was making a special appearance for the bail

55

revocation hearing; he had just been hired the day before; he had not had time to prepare; and he asked the court to continue the hearing. The court relieved Robert P. and gave defendant the option of defending the bail revocation motion in propria persona. Defendant claimed that all of his prior attorneys, including Robert P. and Ken B., had "colluded" against him with the prosecutor, and that the court lacked jurisdiction to proceed with the hearing. Defendant also denied he had hired Ken B. and said, "I would like to fire him."

The court proceeded with the hearing, with Ken B. representing defendant. Shortly before the hearing began, defendant was remanded into custody for continuing to interrupt the court, after the court admonished him that he would be remanded if he did so. At the conclusion of the hearing, defendant was ordered remanded into custody without bail. The court found that defendant would not follow court orders, he was inherently dangerous, and his behavior was "going to get someone killed."

The case was set for trial on January 22, 2018. On January 11 and 17, defendant requested more time to retain counsel. On January 19, he still did not have counsel. The court told defendant that, because he would not listen to court orders, the court would not allow him to represent himself at trial until he was evaluated, and that could not occur until he had counsel. The court vacated the January 22 trial date, set a trial readiness conference on January 26, and set trial on January 29.

On January 26, 2018, defendant said he had retained an attorney, Mark C., but claimed that Mark C. had "backed out" of representing him after "he was threatened and intimidated by the district attorney." Defendant said he wanted to represent himself.

Attorney Brian W., who supervised the conflict panel, appeared on January 26 and confirmed that the entire conflict panel could not represent defendant due to conflicts. The court's judicial assistant contacted attorney Peter S., who agreed to appear in court on January 29.

On January 29, 2018, Peter S. appeared by special appointment by the court and entered not guilty pleas for defendant on the second amended information. Peter S. said he had met with defendant that morning and recommended that the court suspend criminal proceedings and institute a section 1368 evaluation to assess defendant's competence to stand trial. The court declared a doubt concerning defendant's competence, suspended the criminal proceedings, ordered two psychological examinations for defendant, and set the next hearing on March 5.

After two psychologists reached different conclusions on defendant's competency to stand trial, the court ordered a third evaluation. The third evaluator found defendant incompetent to stand trial.

At the next court hearing on April 23, 2018, Peter S. told the court that defendant did not want Peter S. to represent him and that defendant wanted to represent himself. Defendant had also filed a complaint against Peter S. with the State Bar. The court found that defendant used such complaints as "a tactic" and set a jury trial to determine defendant's competence to stand trial.

During the jury trial on defendant's competence, defendant told the court he would like a different appointed attorney, other than Peter S., and the court denied the request. Later during the trial, defendant again asked for another attorney because Peter S. was

"lying." Again, the court denied the request. Shortly before defendant accused Peter S. of "lying," Peter S. objected to defendant testifying at the trial, and the court did not allow defendant to testify. The next day, defendant told the court he was "firing" Peter S., and the court again denied the request. Peter S. argued to the jury that defendant was incompetent to stand trial, that is, he could not, in a rational manner, help Peter S. defend him, and two of the evaluators testified that defendant had paranoid delusional disorder and should be hospitalized.

On June 20, 2018, the jury found defendant competent to stand trial. On July 3, Peter S. moved to be relieved as defendant's counsel, based on defendant's repeated requests to fire Peter S. and to represent himself. The court granted Peter S.'s motion, relieved Peter S., and later granted defendant's *Faretta* request to represent himself. As noted, defendant represented himself at trial. He testified he had had 14 attorneys and there had been 14 judges in the case, and all of them had colluded with the prosecutor and "deprived" him of his rights.

The jury returned its guilty verdicts on February 7, 2019. On March 8, the original sentencing date, defendant asked the court to continue the sentencing hearing and to appoint an attorney to represent him in filing a new trial motion and for sentencing. He told the court he was physically disabled, he could hardly work, and he was "under heavy medication."

After Michele gave a victim impact statement and testified that defendant owed her a total of $26,826.80 in restitution, the court continued the hearing to April 19, 2019, in order to find an attorney for defendant. The court told defendant that finding an

attorney for him would take time because "most attorneys" in the county had "conflicted off" his case.

On March 26, 2019, the court reappointed Peter S. On April 9, defendant filed a motion to disqualify the trial judge, his fifth such motion against the trial judge, based on Peter S.'s appointment. In this motion, defendant described Peter S. as "a corrupt and malicious attorney who was forced upon him," and who had declared him incompetent.

On April 19, 2019, Peter S. and defendant appeared in court, and the matter was continued to June 28. On April 19, defendant objected to Peter S.'s appointment, saying he had not appointed Peter S. On June 18 and 19, defendant filed a motion for a new trial and a motion to reinstate his in propria persona status, both without Peter S.'s assistance.

On June 28, 2019, the court struck defendant's fifth disqualification motion as being without merit and having "no basis in fact or reality." The court also struck defendant's new trial motion and defendant's motion to reinstate his in propria persona status. Defendant then made a *Marsden* motion to relieve Peter S. and another *Faretta* motion to resume his in propria persona status. The court first heard the *Marsden* motion.

During the *Marsden* hearing, defendant claimed that, before trial, Peter S. had "fraudulently declared" him incompetent to stand trial after speaking with defendant for only 10 minutes. He claimed that Peter S. told the jury during his competency trial that he was " a dangerous criminal" who "needed to be put away," and he questioned how Peter S. could defend him against Michele's restitution claim, or adequately represent him on his new trial motion or at sentencing, if Peter S. believed he was such a dangerous

criminal. He believed Peter S. agreed with "everyone" that he should receive the maximum sentence. In addition, Peter S. had not done "a single thing" about his pending restitution hearing or his motion for new trial.

The court said it was "a little disingenuous" for defendant to claim Peter S. had not done anything because Peter S. had not had an opportunity to "fully review the case," including the trial transcripts or Michele's restitution claim. Peter S. was not appointed on March 8, 2019, when Michele testified about the restitution she was owed, and Peter S. would have to read the trial transcripts before filing a new trial motion. The transcripts had not been ordered because the case had been stayed on appeal, pending a ruling on whether the court had properly struck one of defendant's disqualification affidavits. But the stay had since been lifted, and the court would now order the trial transcripts.

Concerning defendant's competency, Peter S. explained that, shortly after he was first appointed to represent defendant before trial, he, Peter S., spoke with the prosecutor and defendant's prior attorneys, and formed the opinion that a section 1368 hearing for defendant was appropriate. The court noted that two psychologists had also determined that defendant was incompetent.

Thus, the court did not find that Peter S.'s representation had been deficient in any respect. The court explained to defendant, and "for the court of appeals," that in the court's opinion, "whatever issues you are experiencing right now are of your own making. These issues are not unique to Mr. [Peter S.]. As evidence of this, the entirety of the San Bernardino County Public Defender's office has recused itself from representing you. The entirety of the San Bernardino County's alternative defense, or

conflict panel, has recused itself from representing you.  All, or at least the vast majority of the private defense attorneys that regularly work in this county have recused themsel[ves] from representation, or refused to accept appointment of this Court.  [¶]  In addition, the majority of private investigators in this county have refused to work with you.  Finally, numerous judges in this courthouse are recused from hearing your cases.

"These are the fact[s], Mr. Dinaali.  The people and the entities designated to provide services to you have all been frustrated and undermined by your conduct.  The attorneys, judges, parties, witness[es], and litigants who have had contact with you have all suffered a detriment.  You have created websites in the names of judges, attorneys— both defense and prosecution—public officials, and witnesses.  And you have posted negative information online against these same people.  You have filed liens, grievances, and complaints against everyone associated with your case.  [¶]  My point is, Mr. Dinaali, that the problem is not with Mr. Peter S., or any of your prior attorneys, or with anyone else associated with your cases.  The problem is you.  You are a difficult—you are difficult and a difficult personality.  It is this Court's opinion that there is no attorney that would be satisfactory to you, except yourself."

The court, thus, denied defendant's *Marsden* motion to relieve Peter S.  The court then denied defendant's *Faretta* motion to represent himself, noting that during trial, "it was clear" that defendant was either "unwilling or unable to control" his behavior "and maintain proper courtroom decorum."

On December 2, 2019, Peter S. filed a motion for a new trial.  On December 13, the day of sentencing, defendant again objected to Peter S.'s representation "in light of

61

the motion that he has a conflict of interest here." Defendant said he "need[ed]" to represent himself. The court denied the requests. As the court was explaining its rulings, defendant continued to interrupt and argue with the court, until he was removed from the courtroom. The court then denied the new trial motion and sentenced defendant.[8]

2. Applicable Law and Analysis

We review the denial of a *Marsden* motion for an abuse of discretion. (*People v. Taylor* (2010) 48 Cal.4th 574, 599.) The denial of a *Marsden* motion is not an abuse of discretion " ' unless the defendant has shown that a failure to replace the appointed attorney would "substantially impair" the defendant's right to assistance of counsel.' " (*People v. Barnett* (1998) 17 Cal.4th 1044, 1085.)

"A criminal defendant is guaranteed the right to the assistance of counsel by the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution. This constitutional right includes the correlative right to

---

[8] On September 27, 2019, Peter S. received the exhibits that the prosecution had submitted in support of Michele's restitution claim, so that Peter S. would be able to present any issues concerning the restitution claim at sentencing on December 13. Peter S. did not raise any issues concerning the restitution claim.

Regarding the new trial motion, Peter S. told the court on December 13 that he could "not find any meritorious issue that would justify a new trial." He had seen from reading the trial transcript that the court had gone "overboard" to ensure that defendant received a fair trial, and defendant had received a fair trial. The only potential issue Peter S. raised in the new trial motion concerned the prosecutor's potential conflict of interest in prosecuting defendant based on defendant's online postings of defamatory statements about the prosecutor. (§ 1424.) But, in the motion, Peter S. noted that the court "thoughtfully" considered the issue and made a reasoned decision not to recuse the prosecutor.

representation free from any conflict of interest that undermines counsel's loyalty to his or her client." (*People v. Doolin* (2009) 45 Cal.4th 390, 417 (*Doolin*).) " 'As a general proposition, such conflicts "embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client or a third person or his own interests." ' " (*Ibid.*)

Defendant claims that Peter S. had an "extremely serious" conflict of interest in representing him in the posttrial proceedings because, during the 2017 jury trial on defendant's competence to stand trial (§ 1368), Peter S. argued that defendant was not competent to stand trial and that defendant's defense theories were " 'ridiculous.' " In the 2017 competence trial, Peter S. argued to the jury that defendant was unable to assist Peter S. in presenting a defense "in a rational manner" because defendant would have Peter S. argue to the jury in his criminal trial that the *entire* San Bernardino County law enforcement and legal community had conspired to bring false charges against him. Peter S. said that defendant would have him "stand in front of a criminal jury and say, hey, the cops are in on it. The judge is in on it. The defense lawyer is in on it. All of his multitude of prior defense lawyers have been in on it. All the DA's have been in on it. I mean *that's ridiculous*." (Italics added.)

As the lengthy history of this case shows, defendant accused *all* of his many attorneys of conspiring against him, and as, therefore, having conflicts of interest in representing him, without basis in fact or reality. The court was aware of this history, and in denying defendant's posttrial *Marsden* motion to relieve Peter S., reasonably rejected defendant's claim that Peter S., too, had such a conflict of interest.

63

Further, Peter S.'s opinion that defendant was incompetent to stand trial and that defendant's conspiracy defense was "ridiculous" did not show that Peter S. had any conflict of interest in representing defendant at any time, including in the posttrial proceedings. There was no evidence that Peter S. had any personal interest, or loyalty to anyone other than defendant, that undermined his loyalty to defendant and that therefore conflicted with his ability to competently represent defendant.

Defendant points out that, at sentencing, Peter S. did not make any argument on his behalf, including that any of his sentences should have been stayed under section 654. Thus, he argues, "the People cannot show beyond a reasonable doubt that Peter S. did not pull his punches, so the sentencing should be reversed."

To the extent defendant is arguing that Peter S. rendered ineffective assistance of counsel at sentencing, it is *defendant*'*s burden* to show that Peter S. had an " ' actual' conflict of interest—one that in fact adversely affected counsel's performance." (*People v. Perez* (2018) 4 Cal.5th 421, 435-436; *Doolin*, *supra*, 45 Cal.4th at pp. 420-421.) Defendant has not made this showing here. He has not shown that Peter S. had an actual conflict of interest such that Peter S. " 'pulled his punches' " by failing to argue that one or more of defendant's sentences on counts 3, 4, or 5 should have been stayed under section 654. (*People v. Perez*, at pp. 435-436.)

D. *Defendant*'*s 365-day Term on Count 4 Was Required To Be Stayed* (§ *654*)

Defendant claims the trial court erroneously failed to stay two of the three terms it imposed on his convictions in counts 3, 4, and 5. He claims these convictions were based

on a single course of conduct and were incident to a single intent and objective; thus, he argues, imposing separate terms on these convictions violated section 654.

We agree that defendant's concurrent, 365-day jail term on count 4 was required to be stayed, because that count was based on the same acts underlying counts 3 and 5. But counts 3 and 5 were based on separate acts, and substantial evidence shows and the trial court could have reasonably found that defendant harbored separate intents and objectives in committing counts 3 and. 5.

1.  Relevant Background

Defendant was convicted of sending a threatening letter with the intent to extort in count 3 (§§ 519, 523), violating the civil restraining order in count 4 (§ 166, subd. (a)(4)), and causing a false document, the $10,655 mechanic's lien, to be recorded in count 5 (§115, subd. (a)).  Defendant was sentenced to four years on count 2 (extortion), consecutive eight-month terms on counts 1 (stalking) and 5 (filing the false mechanic's lien), plus a consecutive one-year term on count 3 (extortion by threatening letter).  A concurrent 365-day jail term was imposed on count 4 (civil restraining order violation).

Michele obtained a civil restraining order against defendant on September 11, 2014.  On September 13, 2014, defendant sent Michele an e-mail, stating he intended to file a (false) $10,655 mechanic's lien against her property unless she paid him the $10,655 sum.  A preliminary notice for filing a $10,655 mechanic's lien was attached to the e-mail.  On November 6, 2014, defendant recorded a false mechanic's lien in the amount of $10,655 against Michele's property.

65

The prosecutor argued that defendant committed count 3 (extortion by threatening letter) by sending Michele the September 13, 2014 e-mail. He also argued that defendant violated the September 11, 2014 restraining order (count 4) *both* by sending Michele the September 13, 2014 e-mail *and* by filing the false $10,655 mechanic's lien on November 6, 2014. He argued defendant committed count 5 by recording the false $10,655 mechanic's lien on November 6, 2014.

2. Applicable Law

Section 654 states in relevant part: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." (Stats. 2021, ch. 441, § 1 (A.B. 518), eff. Jan. 1. 2022.)

" ' "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." ' " (*People v. Capistrano* (2014) 59 Cal.4th 830, 885.) Multiple punishment is permissible, however, when the defendant had a separate intent and objective for each offense for which he was convicted. (*Id*. at p. 886.)

"Whether section 654 applies in a given case is a question of fact for the trial court, which is vested with broad latitude in making its determination. [Citations.] Its findings will not be reversed on appeal if there is any substantial evidence to support them. [Citations.] We review the trial court's determination in the light most favorable

to the respondent and presume the existence of every fact the trial court could reasonably deduce from the evidence." (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.) Section 654 also bars multiple punishment for convictions that are based on a single act. (*People v. Jones* (2012) 54 Cal.4th 350, 360.)

    3. Analysis

Defendant claims that one of his sentences on counts 3, 4, and 5 should have been stayed under section 654 because his convictions in these counts are based on "a single course of conduct" incident to a single intent and objective: to "lawfully" record the $10,655 mechanic's lien against Michele's property.

He claims his actions in committing counts 3, 4, and 5 constitute a single course of conduct because, in order to lawfully record the $10,655 mechanic's lien, he first had to serve a preliminary notice on Michele, which he did by his September 13, 2014 letter. He also notes that, in rebuttal closing argument, the prosecutor linked his acts in committing counts 3, 4, and 5, as if his acts constituted a single course of conduct: "once he sent it [the September 13, 2014 e-mail], then that was a threatening letter to extort. It violated the restraining order. And once he recorded it [the mechanic's lien], that's the false document."

But "[i]t is the defendant's intent and objective, not the temporal proximity of his offenses, which determine whether the transaction is indivisible." (*People v. Harrison* (1989) 48 Cal.3d 321, 335.) Here, substantial evidence shows, and at sentencing the trial court could have reasonably found, that defendant harbored separate intents and objectives in committing counts 3 and 5. The record also shows that counts 3 and 5 were

67

based on separate acts. Count 4, however, was based on the same acts underlying counts 3 and 5. Thus, the 365-day jail sentence on count 4 should have been stayed.

*Count 3:* Substantial evidence shows that defendant was convicted in count 3 of sending Michele a threatening letter—the September 13, 2014, letter—in which he threatened to file a $10,655 mechanic's lien against Michele's property unless she paid him the $10,655 sum. (CALCRIM No. 1831.) The record permits a reasonable inference that, in sending the September 13 threatening letter, defendant intended to *extort an immediate payment of $10,655* from Michele. The act underlying count 3 is defendant's act of sending Michele the September 13 threatening letter.

*Count 4:* The record shows defendant could have been convicted of violating the September 11, 2014 civil restraining order (count 4) based on two acts: (1) his act of sending Michele the September 13 threatening letter, and (2) his act of recording the $10,655 false mechanic's lien against her property on November 6, 2014. But defendant's act of sending Michele the September 13 threatening letter was the basis of his conviction in count 3, and his act of recording the $10, 655 false mechanic's lien was the basis of his conviction in count 5.

*Count 5:* The record shows that defendant committed count 5 (filing a false document) by causing the false $10,655 mechanic's lien to be recorded against Michele's property on November 6, 2014. Thus, defendant's conviction in count 5 is based on his singular act of causing the $10,655 lien to be recorded. Substantial evidence also shows, and the court could have reasonably concluded that defendant harbored an intent and objective in committing count 5, separate from and independent of his intent and

68

objective in committing count 3:  that is, to cause damage to Michele's property rights and to prevent her sale of, or further refinance of, the property.

In sum, the record shows that counts 3 and 5 were based on separate acts and separate intents and objectives.  Count 4, however, is based on the same acts underlying count 3 (the Sept. 13 threatening letter) and count 5 (the recording of the $10,655 mechanic's lien).  Thus, the concurrent 365-day jail term on count 4 should have been stayed.

## IV.  DISPOSITION

The judgment is modified to stay defendant's concurrent, 365-day jail term on count 4.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS_____
                                                            Acting P.J.

We concur:


RAPHAEL_____
                        J.


MENETREZ_____
                        J.

69